IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:20-CV-91-FL

| | |
|---|---|
| CHRISTEL WHITFIELD, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ORDER |
| DLP WILSON MEDICAL CENTER, LLC, | ) ) ) ) |
| Defendant. | ) ) |

This matter comes before the court on defendant's motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6). (DE 16). The issues raised have been fully briefed, and in this posture are ripe for ruling. For the reasons that follow, defendant's motion is granted.

## STATEMENT OF THE CASE

Plaintiff commenced this action in Wilson County Superior Court on January 23, 2020, alleging unlawful termination and hostile work environment by defendant on the basis of her race in violation of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981. Plaintiff also alleges several claims under North Carolina law. On March 11, 2020, the case was removed to this court. After several extensions of time, defendant filed the instant motion.

## STATEMENT OF FACTS

The facts alleged in the complaint may be summarized as follows. Beginning in October 2015, defendant employed plaintiff as a Certified Nursing Assistant II ("CNA") and a Unit

Secretary. (Compl. ¶ 8). In January 2016, defendant hired another CNA named Crystal Wieland ("Wieland"). (Id. ¶ 9). Because plaintiff and Wieland had similar names, co-workers tried to come up with a way to distinguish who they were talking to when they addressed plaintiff and Wieland. (Id. ¶¶ 10–11).

One nurse, Penny LaPointe ("LaPointe"), decided that the best way to distinguish between plaintiff and Wieland was to call plaintiff "black Christel" and the new CNA "white Crystal."[1] (Id. ¶ 12). Plaintiff told LaPointe that she did not like or want to be called "black Christel" and that she preferred to be called Whitfield, Rae, or Ms. Christel. (Id. ¶ 13). However, LaPointe ignored plaintiff's request and continued to refer to plaintiff as "black Christel." (Id. ¶¶ 14, 17). Eventually, other nurses, including Tammy Brock ("Brock"), also started to refer to plaintiff as "black Christel," though they ceased doing so at plaintiff's request. (Id. ¶¶ 15, 16).

A few months later, Wieland stopped working at the hospital. (Id. ¶ 18). Although plaintiff thought that things might go back to normal, LaPointe started referring to plaintiff as "black Heifer." (Id.). Plaintiff asked LaPointe why she was calling plaintiff that, and LaPointe responded by shrugging her shoulders and responding "I don't know." (Id. ¶ 19). LaPointe continued to address plaintiff as "black Heifer." (Id. ¶ 20).

In June 2016, the name calling escalated. (Id. ¶ 22). LaPointe made a remark to plaintiff, but plaintiff did not understand what LaPointe said. (Id. ¶ 23). When plaintiff asked for clarification, LaPointe responded "You heard me you black b* * * *." (Id.). The next day, plaintiff called the supervisor, Zandra Holloman ("Holloman") and reported the incident the day before as well as prior comments she had been forced to endure since the beginning of the year. (Id. ¶ 25).

---

[1]  LaPointe was initially named as a defendant in this action. However, she was voluntarily dismissed by plaintiff on April 3, 2020.

Holloman assured plaintiff that she would take care of the issue. (Id. ¶ 26).

When plaintiff returned to work, LaPointe walked in and said something to her. (Id. ¶ 27). Plaintiff did not hear what LaPointe said, asked her to repeat herself, and LaPointe responded "You heard me you black b* * * *." (Id. ¶ 28). Plaintiff immediately sought out Holloman, told Holloman that LaPointe had just called her a black b* * * *, and asked Holloman if she had spoken to LaPointe about what had previously happened. (Id. ¶¶ 29, 31, 32). Holloman responded that she had not. (Id. ¶ 32). Plaintiff asked Holloman why she did not speak to LaPointe, to which Holloman responded that she wanted to hear LaPointe say it. (Id. ¶ 33). Plaintiff then asked Holloman if she wanted LaPointe to call her a black b* * * *, to which Holloman replied that she did not and that she would take care of it. (Id. ¶ 34).

In light of Holloman's previous failure to take corrective action, plaintiff complained to Debra Bradshaw ("Bradshaw"), defendant's Human Resources Officer. (Id. ¶ 35). A couple days later, plaintiff met with Holloman and Amy, Holloman's next in line supervisor, in the Human Resources department with Bradshaw. (Id. ¶¶ 30, 37). During the meeting, Bradshaw informed plaintiff that they had talked with LaPointe, who admitted that she had called plaintiff the names and that plaintiff had asked her to stop. (Id. ¶¶ 38–40). Believing that the working environment would not change, plaintiff met with the House Supervisor and told her about the past incidents and that she did not want to work with LaPointe. (Id. ¶ 41). The House Supervisor transferred plaintiff to the Psych/ED floor for a day. (Id. ¶ 42).

On September 25, 2017, plaintiff obtained a position at UNC Hospital. (Id. ¶ 43). Plaintiff gave her supervisor a two-week notice. (Id. ¶ 44). Plaintiff was terminated during the two-week notice period for calling-out of work for one day which was the last day of the two-week notice. (Id. ¶¶ 8, 45).

3

**COURT'S DISCUSSION**

A.  Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009) (citations omitted).

B.  Analysis

   1.  Timeliness of Defendant's Motion

Plaintiff argues that defendant's motion is untimely because it was filed more than 21 days after removal of the case to federal court. However, on March 13, 2020, the court granted defendant an extension of time until April 8, 2020, to answer, move, or otherwise plead in response to plaintiff's complaint. (Order (DE 13) at 1); see Fed. R. Civ. P. 6(b)(1)(A). Defendant filed the instant motion on April 3, 2020. Defendant's motion is timely filed.

   2.  42 U.S.C. § 1981

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . , and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ." 42

4

U.S.C. § 1981(a).  "[T]he term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Id. § 1981(b).  "The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law." 42 U.S.C. § 1981(c).

      a.      Hostile Work Environment

To state a claim for hostile work environment under § 1981, plaintiff must allege harassment that was (1) unwelcome; (2) based on race; (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) imputable to defendant as plaintiff's employer. E.E.O.C. v. Xerxes Corp., 639 F.3d 658, 668 (4th Cir. 2011); Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183–84 (4th Cir. 2001) (explaining the elements for a claim of hostile work environment are the same under § 1981 as they are under Title VII).

As to the third element, for misconduct to be severe or pervasive, the work environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998); Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998).  Whether harassment gives rise to an objectively hostile work environment requires an assessment of the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).  "[M]ere utterance of an . . . epithet which engenders offensive feelings in a employee," is insufficient to create an actionable hostile work environment. Id. at 21 (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)).  Moreover, "simple

5

teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Faragher, 524 U.S. at 788 (citations and internal quotation marks omitted). "[I]ncidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard." Evans v. Int'l Paper Co., 936 F.3d 183, 192 (4th Cir. 2019) (internal citation omitted). "Thus, rude treatment from coworkers, callous behavior by one's superiors, or a routine difference of opinion and personality conflict with one's supervisor are not actionable." Id.

Verbal harassment can, in certain situations, cross the line from rude treatment to objectively severe or pervasive racially hostile work environment. In Freeman v. Dal-Tile Corp., the could held that a client's "use of the word 'n* * * *r," coupled with the on-going offensive racial talk, use of the term 'black b* * * *' on more than one occasion (once directed at a black employee), and sexual talk regarding black women" was objectively severe or pervasive to create a hostile work environment for plaintiff. 750 F.3d 413, 422 (4th Cir. 2014). In E.E.O.C. v. Cent. Wholesalers, Inc., the court held a racially charged hostile work environment objectively severe or pervasive where three co-workers' daily use of the word n* * * * *, combined with one heated incident where a co-worker called plaintiff many racially derogatory terms, and two co-workers keeping blue-colored mop-head dolls in their offices which they had hanging by nooses tied around the dolls' necks. 573 F.3d 167, 176–77 (4th Cir. 2009); see also White v. BFI Waste Servs., LLC, 375 F.3d 288, 297 (4th Cir. 2004) (holding severe or pervasive supervisors repeatedly calling plaintiff and other black employees "boy, jigaboo, [n * * * * *], porch monkey, Mighty Joe Young," and "Zulu warrior"); Spriggs, 242 F.3d at 182, 184–86 (holding objectively severe or pervasive a supervisor's "continuous daily" use of racial slurs, including "odious" terms such as n* * * * * and monkey, as well as placing a picture of a monkey in a manual used by plaintiff and

6

talking about plaintiff's wife in racially derogatory terms).

However, "[t]he existence of a hostile environment cannot be predicated upon acts that are isolated or genuinely trivial." Carter v. Ball, 33 F.3d 450, 461 (4th Cir. 1994) (holding that a supervisor's display of a gorilla poster and that supervisor's references to it were not severe or pervasive). In Perkins v. Int'l Paper Co., the court held that second-hand comments overhead by plaintiff about a white employee making and wearing a KKK hat at work in 2006 and a white employee, when given a work assignment, complain that he was being asked to work like a n * * * * * in 2014 were not severe or pervasive. 936 F.3d 196, 204, 210 (4th Cir. 2019). Similarly, in Honor v. Booz-Allen & Hamilton, Inc., the court found one statement by a co-worker that, in reference to plaintiff, "she didn't know how to work with an African–American male" was not severe or pervasive. 383 F.3d 180, 191 (4th Cir. 2004).

Here, plaintiff fails to plausibly allege an objectively hostile work environment. The alleged discriminatory conduct was not frequent — plaintiff was allegedly referred to as "black Christel" an unspecified number of times, "black heifer" once, and "black b * * * *" twice over a period of six months by her coworkers. (See Compl. ¶¶ 9, 12–18, 22–28). The harassment was not objectively severe or pervasive. Only some of plaintiff's coworkers referred to plaintiff as "black Christel," and all of them stopped at plaintiff's request save LaPointe. (Id. ¶¶ 13–17). LaPointe, plaintiff's antagonist, was a co-worker without supervisory authority over plaintiff. (See id. ¶ 12). Though confrontational, LaPointe's comments are merely offensive utterances than physically threatening or humiliating remarks. (See id. ¶¶ 18, 23, 28). Moreover, plaintiff fails to allege that LaPointe's comments unreasonably interfered with her job performance. After plaintiff raised her complaints about LaPointe's conduct in June 2016 to her supervisor and to human resources, LaPointe was questioned about her conduct. (Id. ¶¶ 25–26, 29–40). The court is left to

7

speculate as to whether defendant's investigation had any effect. Plaintiff does not allege facts from which the court may reasonably infer that LaPointe or any of defendant's other employees engaged in racial harassment from June 2016 to October 2017. Instead, plaintiff conclusively asserts, without any factual support, that she "knew that the working environment would not change." (Id. ¶ 41). In sum, the isolated events alleged by plaintiff do not allow for a plausible inference that the racial harassment by defendant's employees was objectively severe or pervasive.

Plaintiff contends that LaPointe's use of the phrases "black b* * * *" and "black heifer" are sufficiently serious to be objectively hostile, relying upon the Fourth Circuit's discussion of the racial epithets "n* * * * *" and "porch monkey" in Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 185 (4th Cir. 2015) (en banc). Plaintiff's reliance upon Boyer-Liberto is misplaced. There, the court held a hostile work environment severe where plaintiff's supervisor[2] twice "employed racial epithets to cap explicit, angry threats that she was on the verge of utilizing her supervisory powers to terminate [plaintiff's] employment." Boyer-Liberto, 786 F.3d at 279–81. In another case, the court found that two anonymous notes left in an African American flight attendant's secured mailbox which made racist death threats were sufficiently severe to alter the conditions of plaintiff's employment. Pryor v. United Air Lines, Inc., 791 F.3d 488, 496–97 (4th Cir. 2015).

When compared to the precedents of Boyer-Liberto and Pryor, the totality of the circumstances alleged in the instant case are not so serious as to create a hostile work environment based on a few isolated uses of racial epithets. As alleged, LaPointe is not plaintiff's supervisor. She was not making angry, explicit threats to terminate plaintiff's employment. She was not making death threats or otherwise threatening plaintiff's physical safety. LaPointe's conduct,

---

[2] A substantial portion of Boyer-Liberto was dedicated to determining whether the employee harassing plaintiff was properly considered her supervisor for purposes of a hostile work environment claim.

though rude and unprofessional, is not so objectively hostile as to amount to a change in the terms or conditions of employment.

Perhaps suggesting that LaPointe referred to plaintiff as "black heifer" more than once or "black b* * * *" more than twice, plaintiff argues that LaPointe called plaintiff these expletives over a nine-month period. (See Compl. ¶¶ 46, 54, 68, 113)). Inferring the frequency of the use of these expletives from the period over which they were allegedly made is speculative. If plaintiff intended to allege that racial epithets were used against her more frequently than the instances alleged, she must allege more than a general time period in which they occurred. Plaintiff's hostile work environment claim is dismissed without prejudice.[3]

b.  Termination

Plaintiff also asserts under § 1981 that she was unlawfully terminated. "Absent direct evidence, the elements of a prima facie case of discrimination . . . are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." Coleman v. Maryland Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010). If plaintiff establishes a prima facie case, the burden shifts to defendant "to produce a legitimate, non-discriminatory reason for the adverse employment action." Guessous v. Fairview Prop. Investments, LLC, 828 F.3d 208, 217 (4th Cir. 2016). If defendant meets this burden of production, then plaintiff bears the burden of demonstrating "that the legitimate reasons offered by the defendant-employer were not its true reasons but were a pretext for discrimination." Westmoreland v. TWC Admin. LLC, 924 F.3d

---

[3]   Defendant argues that plaintiff's second claim for harassment is duplicative of her first claim for hostile work environment under § 1981. Plaintiff agrees with defendant's argument and recommends that the court dismiss the claim. Where plaintiff has abandoned her second claim for harassment, the court dismisses the claim with prejudice. See, e.g., Cashwell v. Town of Oak Island, 383 F. Supp. 3d 584, 590 (E.D.N.C. 2019); Al-Deen v. Trustees of Univ. of N. Carolina, Wilmington, 102 F. Supp. 3d 758, 768 (E.D.N.C. 2015).

9

718, 729 (4th Cir. 2019).

Plaintiff fails to plausibly allege that her termination was because of her race. Even assuming arguendo that she alleges a prima facie case of race discrimination, plaintiff herself identifies defendant's reason for terminating her: that she called out of work on the last day of her two-week notice period which commenced September 25, 2017. (Compl. ¶ 46). Plaintiff's complaint also fails to allege any facts from which the court might reasonably infer defendant's decision was a pretext for racial discrimination.[4] The verbal harassment of which plaintiff complains allegedly occurred from January 2016 to September 2016. (See id. ¶ 46). Plaintiff's supervisor and the Human Resources department allegedly failed to investigate LaPointe's misconduct in or around June 2016. (See id. ¶¶ 22, 25, 27, 35–37). The paucity of facts connecting these actors and substantially earlier events to plaintiff's October 2017 termination over one year later precludes any reasonable inference that her termination was racially motivated.

For these reasons, plaintiff's § 1981 claim also is dismissed without prejudice as to her claim that she was unlawfully terminated.[5]

3. Negligence Claims

a. Negligent Infliction of Emotional Distress

To state a claim for negligent infliction of emotional distress ("NIED"), plaintiff must allege that "(1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress (often referred to as 'mental

---

[4] For the same reasons, plaintiff fails to plausibly allege that her termination was a pretext for retaliation. See Strothers v. City of Laurel, Maryland, 895 F.3d 317, 327 (4th Cir. 2018); Foster v. University of Maryland-Eastern Shore, 787 F.3d 243, 250 (4th Cir. 2015).

[5] The court dismisses without prejudice plaintiff's state common law claim for wrongful discharge in violation of public policy on similar grounds. See N.C. Gen. Stat. § 143–422.2; Kurtzman v. Applied Analytical Indus., Inc., 347 N.C. 329, 331 (1997); Abels v. Renfro Corp., 335 N.C. 209, 218 (1993); Coman v. Thomas Mfg. Co., 325 N.C. 172, 175 (1989).

10

anguish'), and (3) the conduct did in fact cause the plaintiff severe emotional distress." Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A., 327 N.C. 283, 304 (1990). "'[S]evere emotional distress' means any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." Id. Although plaintiff conclusively alleges that defendant's employees caused her emotional distress, (see Compl. ¶¶ 41, 49, 50), she fails to plausibly allege severe emotional distress as is required to sustain a NIED claim under North Carolina law. Accordingly, plaintiff's NIED claim is dismissed without prejudice.

    b.  Negligent Supervision and Retention

To plead negligent supervision or retention, plaintiff must allege "(1) that an incompetent employee committed a tortious act resulting in injury to the plaintiff; and (2) that prior to the act, the employer knew or had reason to know of the employee's incompetency." Smith v. First Union Nat. Bank, 202 F.3d 234, 250 (4th Cir. 2000); Waddle v. Sparks, 331 N.C. 73, 87 (1992); Medlin v. Bass, 327 N.C. 587, 590–91 (1990).

Plaintiff generally alleges that defendant negligently supervised or retained LaPointe by allowing LaPointe to verbally harass and intimidate plaintiff. (See Compl. ¶¶ 88, 90–93). However, claims of harassment or retaliation, standing alone, are not tortious conduct that sustains a negligent supervision and retention claim. See McLean v. Patten Communities, Inc., 332 F.3d 714, 716, 719 (4th Cir. 2003); Smith v. First Union Nat. Bank, 202 F.3d 234, 247 (4th Cir. 2000); Johnson v. North Carolina, 905 F. Supp. 2d 712, 726 (W.D.N.C. 2012); Jackson v. FKI Logistex, 608 F. Supp. 2d 705, 708 (E.D.N.C. 2009). Likewise, plaintiff's alleged wrongful discharge in violation of public policy, which the court has dismissed for failure to state a claim, is a tort

committed against plaintiff by her employer, rather than employees. See Coman, 325 N.C. at 175–76.

Plaintiff argues that tortious acts committed include racial harassment, racial discrimination, negligence, intimidation (assault and battery), emotional distress, retaliation, and wrongful termination. (Pl. Resp. (DE 19) at 17). As discussed, several of these alleged forms of misconduct are not torts under North Carolina law. Others are not alleged tortious conduct of employees, but defendant as the employer. Still others, such as negligence, assault and battery, and intentional infliction emotional distress, are not pleaded or otherwise fail to state a claim for reasons discussed herein. In sum, plaintiff's negligent supervision and retention claim is deficient and must be dismissed without prejudice.

        c.        Negligence

"To state a claim for common law negligence, a plaintiff must allege: (1) a legal duty; (2) a breach thereof; and (3) injury proximately caused by the breach." Stein v. Asheville City Bd. Of Educ., 360 N.C. 321, 328 (2006). "Thus, the threshold question" to any negligence claim "is whether plaintiffs successfully allege defendant had a legal duty." Id. Plaintiff alleges that defendant had a duty to exercise due care in supervising and retaining its employee, LaPointe. (Compare id. ¶¶ 101–03 with id. ¶¶ 90–92).

Plaintiff argues that "North Carolina recognizes a cause of action against an employer for negligence in employing or retaining an employee whose wrongful conduct injures another." (Pl. Resp. (DE 19) at 15 (citing Hogan v. Forsyth Country Club Co., 79 N.C. App. 483, 495 (1986)). However, Hogan supports the court's position, explaining that negligent supervision and retention is a theory of liability "based on negligence, the employer being held to a standard of care that would have been exercised by ordinary, cautious and prudent employers under similar

12

Case 5:20-cv-00091-FL   Document 21   Filed 08/26/20   Page 12 of 14

circumstances." 79 N.C. App. at 494–95 (citing Pleasants v. Barnes, 221 N.C. 173 (1942); Lamb v. Littman, 128 N.C. 361 (1901)). Where plaintiff alleges defendant has a duty to exercise due care in supervising and retaining its employees, whether defendant breached such a duty is governed by the standards of negligent supervision and retention. See Smith, 202 F.3d at 250.

Plaintiff also argues that defendant may be held vicariously liable for its employees' conduct. (Pl. Resp. (DE 19) at 15 (citing Woodson v. Rowland, 329 N.C. 330, 348 (1991)). To plead vicarious liability in this context, plaintiff must allege an employee caused actionable injury to plaintiff and 1) defendant expressly authorized the employee to do so, 2) the employee's wrongful conduct was done within the scope of her employment, or 3) defendant ratified the employee's conduct. See Snow v. De Butts, 212 N.C. 120, 122 (1937). Plaintiff does not plead vicarious liability, but instead pleads duties defendant allegedly owed directly to plaintiff. As alleged, plaintiff's negligence claim is duplicative and is dismissed without prejudice.

4. Retaliation

Plaintiff alleges defendant is liable for retaliation under the North Carolina Retaliatory Employment Discrimination Act ("REDA") and the North Carolina Whistleblower Protection Act ("NCWPA"). Before filing a lawsuit under REDA, plaintiff must file a complaint with the North Carolina Commissioner of Labor, obtain a right-to-sue letter from the Commissioner, and file suit within 90 days of receiving that letter. N.C. Gen. Stat. §§ 95-242(a), 95-243(b), (e). These claim processing rules[6] are mandatory under North Carolina law. See, e.g., Brackett v. SGL Carbon Corp., 158 N.C. App. 252, 256–57 (2003); Telesca v. SAS Inst. Inc., 133 N.C. App. 653, 655–56

---

[6] Under federal law, Title VII's charge filing requirements nonjurisdictional grounds for dismissal. See Fort Bend Cty., Texas v. Davis, 139 S. Ct. 1843, 1848–52 (2019). The court interprets the administrative requirements of REDA consistently with Title VII, and concludes that defendant's exhaustion argument is properly brought as a ground for failure to state a claim, rather than lack of subject matter jurisdiction. See N. Carolina Dep't of Correction v. Gibson, 308 N.C. 131, 136 (1983) ("[W]e look to federal decisions for guidance in establishing evidentiary standards and principles of law to be applied in discrimination cases.").

(1999). Plaintiff does not allege that she exhausted her administrative remedies under REDA. (See Compl. ¶ 115).

The NCWPA imposes certain requirements on, and provides protection from retaliation to, state employees who report misconduct of a state agency or state employee. See N.C. Gen. Stat. §§ 126-84, 126-85. Individuals who are not state employees "[are] not entitled to protection under the provisions of the North Carolina Whistleblower Act." Johnson v. Forsyth Cty., 227 N.C. App. 276, 277 (2013). Plaintiff does not allege that defendant is a state employer. (See Compl. ¶¶ 7, 114). Plaintiff's retaliation claims are therefore dismissed without prejudice.

## CONCLUSION

Based on the foregoing, defendant's motion to dismiss (DE 16) is GRANTED. Plaintiff's second cause of action is DISMISSED WITH PREJUDICE. Plaintiff's remaining causes of action are DISMISSED WITHOUT PREJUDICE. Within 21 days, plaintiff is ALLOWED to file motion to amend, together with proposed amended complaint, correcting the deficiencies noted herein. Should plaintiff fail so to file, the clerk is DIRECTED to close this case without further order from the court.

SO ORDERED, this the 26th day of August, 2020.

_____
LOUISE W. FLANAGAN
United States District Judge